COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-112-CR

 

 

TERRANCE FORD                                                                             APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

                FROM
THE 16TH DISTRICT COURT OF DENTON COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------








A
jury convicted Appellant Terrance Ford of possession of a controlled substance
with intent to deliver and assessed his punishment at life imprisonment.  The trial court sentenced him
accordingly.  In two points, Appellant
contends that the evidence is legally and factually insufficient to support his
conviction.  Specifically, he contends
that there is no evidence or insufficient evidence that he possessed the
drugs.  Because we hold that the evidence
is legally and factually sufficient to support Appellant=s
conviction, we affirm the trial court=s
judgment.

The
arresting officer, DPS Trooper Woody Gosser, testified that he stopped a car
for speeding on I-35 in Denton County, Texas. 
The car was traveling seventy miles per hour in a sixty-five miles-per-hour
zone.  Gosser explained that in drug
interdiction, law enforcement officers look for cars traveling under the speed
limit or those traveling Ajust over the posted speed
limit@
because typically, persons transporting large amounts of narcotics are not
going to travel at a speed that is much more than the speed limit.

The
car=s
windows, excluding the windshield, were tinted black.  As Gosser approached the car from the
passenger side, he noticed that the rear passenger window came down.  He smelled burnt marijuana.  As he moved closer to the rear passenger, the
rear passenger window closed, and the driver=s
window rolled down.  When Gosser first
walked up and looked in the car, he noticed that three men were in the car, and
he saw Ablunt@
material on the floorboard and in the ashtray. 
That is, tobacco that appeared to have been taken out of a cigar was
hanging out of the ashtray, and the cellophane wrapper of a cigar was on the
floorboard.  According to Gosser, the
cellophane contained enough tobacco to cover an entire cigar.  After seeing the Ablunt@
material, Gosser decided to search the car.








Gosser
testified that Appellant was the rear passenger and identified him at
trial.  Gosser testified that during the
stop, Appellant was overly nervous and breathing hard, his hands were shaking,
he really would not look at Gosser, and he did not want anything to do with
Gosser.

The
driver was interviewed separately from his two passengers for safety reasons,
according to Gosser.  The driver told
Gosser that Appellant had flown from Oklahoma City to Houston for a wedding but
that the driver and the front seat passenger were using the driver=s
girlfriend=s
car to take Appellant back to Oklahoma City in a quick turnaround trip.  The three men led Gosser to believe that they
were cousins.

Gosser
testified that second- or third-party cars are typical in the transport of
large quantities of drugs because such vehicles cannot be seized.  He also testified that Houston is a source
city, or a place Awhere large quantities of
narcotics are broke[n] down or shipped to and the people come in and buy and
distribute out to their destination,@ and
that Oklahoma City is actually becoming both a source and a destination point
but that Ait=s
usually just a destination point.@  Finally, he testified that unreasonable
travel plans are also something that he is Atrained
to look for@ in
drug interdiction, and he classified the three men=s
story as unreasonable.

Gosser
testified that in searching the car, he found approximately eight cell
phones.  They were all around the
passenger compartmentCthe front passenger seat,
the back seat, the center console, A[a]round
the car,@ and
Aeverywhere
[the officer] turned.@  Jeff Davis, supervisor of the Denton County
Drug Enforcement Unit, testified that the number of cell phones was significant









[b]ecause
normally what people do that are involved in the drug trade, is they=ll haveCthis is basically my business
phone, and your business phone is your dirty phone.  Usually it=s a prepaid phone like Boost or Verizon sells
them.  You can buy them for 19.99, load
them with minutes, and if you get in trouble you can throw them out the window,
and you have lost 20 bucks.  

 

Then they=ll have the phone they use with the family,
normal communication that may or may not be in their name, but nobody involved
in this business is going to call this phone. 
The only phone calls you get on the dirty phone are related to
this.  Like I said, that=s a dime a dozen.

 

A lot of times they=re also aware of
Title III investigations with the Federal Government; we do wiretap
investigations.  They know that we do
Title III investigations, so they change their phone numbers continuously.  19.99, you can buy a phone, and it can be
gone the next [da]y.  They roll them over
and over and over.  When they do that,
they accumulate phones.  

 

It=s not uncommon for us to run search warrants
and find drawers full of cell phones. 
That=s phones that
basically have run their course, and they dispose of them.  They call them burners, is what they=re called.  They=ll use their burner until they get done using
their burner.  Or somebody goes to jail that=s one of their
associates, that phone is in the trash, that phone=s out.  They=ll just keep rotating the phones over and
over.

 

Gosser also found Alarge
amounts of trash in the backseat, fast food wrappers, things like that from
going through drive-thrus.@  He explained at trial that people
transporting large quantities of drugs do not want to leave their car, so they
go to fast-food places.  Davis pointed
out to the jury that vehicles carrying large quantities of drugs have Aindicators
inside the vehicle of long travel; [the people transporting the drugs are]
basically living out of a car@
because they are responsible for getting the drugs safely from Point A to Point
B.








Gosser
also noticed that the car=s air fresheners were fresh,
and he explained to the jury that it is common practice to use air fresheners
to mask the scent of narcotics when hauling large amounts.  Davis similarly testified that multiple air
fresheners would be used to mask the odors in vehicles transporting large
quantities of drugs.

A
search of the trunk yielded just under four kilograms of cocaine hidden under
the lining of the trunk.  The drugs
consisted of five separate bundles, three wrapped in duct tape and two wrapped
in electrical tape.  Gosser testified
that it was Aeight
and a half pounds of quality cocaine that is not for personal use of anybody in
the car. . . . It=s packaged and concealed
inside of a vehicle that=s consistent with the
distribution of narcotics.@  Davis testified that the cocaine would be
worth about $400,000 to end users.  He
also testified that having multiple people in the vehicle, known in the drug
trade as Arolling@ or Arunning
cat,@ is
a way of protecting the drugs during transport and also at the location of the
sale.  Finally, when questioned,

In
your training, in your years of experience, Jeff, is it conceivable, based on
what you know, that there could be three people who are close to each other,
who know each other well, running this amount of dope from a hub city or source
city to a destination city and somebody not be in on it?

 

Davis
answered, ANo.@

 

Nobody=s
fingerprints were on the cocaine.  No
weapons or other drugs, including marijuana, were found.  After Gosser found the cocaine, he arrested
all three men.  He explained to the jury
why he arrested all three men:








[I]t=s the total amount of
everything that I saw out there all on the side of the road:  The travel plans, the marijuana‑type
issue with the cigars, the air fresheners, the trash, the eight cell phones.  The origin of Houston, destination of
Oklahoma City; the travel plans of flying there but, you know, 15‑, 18‑hour
trip back with a large amount of cocaine that costs a large amount of money,
you would have to have a vested interest to be in that vehicle.

 

He based his conclusions on
experience and training.

In
his two points, Appellant contends that there is no evidence or insufficient
evidence that he possessed the drugs; specifically, he argues that there is no
evidence or insufficient evidence that he knew the cocaine was in the trunk of
the car.  As the Texas Court of Criminal
Appeals has held,

To prove unlawful possession
of a controlled substance, the State must prove that: (1) the accused exercised
control, management, or care over the substance; and (2) the accused knew the
matter possessed was contraband.  Whether
this evidence is direct or circumstantial, Ait
must establish, to the requisite level of confidence, that the accused=s
connection with the drug was more than just fortuitous. This is the whole of
the so‑called >affirmative links=
rule.@[2]








Given the men=s
close relationship, the presence of the Ablunt@
materials, the odor of marijuana, the presence of the cocaine in the vehicle in
which they traveled, the large amount of the cocaine, Appellant=s
extreme nervousness at the stop, the presence of the many cell phones, fresh
air fresheners, and fast-food trash, and the purported reason for all three men
being in the car, and applying the appropriate standard of review,[3]
we hold that the evidence is legally sufficient to support Appellant=s
conviction.  We overrule Appellant=s
first point.

Further,
despite the absence of marijuana from the scene, and despite the evidence that
Appellant did not drive or own the car, that there were two other people in the
car, and that the cocaine was hidden in the trunk, and applying the appropriate
standard of review,[4]
we hold that the evidence is factually sufficient to support Appellant=s
conviction.  We overrule his second
point.

Having
overruled both of Appellant=s
points, we affirm the trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  July 15, 2010











[1]See Tex. R. App. P.
47.4.





[2]Poindexter v. State, 153 S.W.3d 402, 405B06 (Tex. Crim. App.
2005) (citations omitted).





[3]See Jackson v.
Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).





[4]See Steadman v. State, 280 S.W.3d 242, 246B47 (Tex. Crim. App.
2009); Watson v. State, 204 S.W.3d 404, 414B15, 417 (Tex. Crim.
App. 2006); Johnson v. State, 23 S.W.3d 1, 9, 12 (Tex. Crim. App. 2000).